UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
―――――――――――――――――――――――――――x

J.S.,

                Plaintiff,

      -against-

DALTON SCHOOLS, INC. and
GARDNER P. DUNNAN,

                Defendants.
―――――――――――――――――――――――――――x

18-cv-10258 (CCC) (SCM)

**AMENDED COMPLAINT
AND JURY DEMAND**

        Plaintiff J.S.[1], by and through her attorneys, Cuti Hecker Wang LLP, 305 Broadway, Suite 607, New York, New York 10007, (212) 620-2603, including Alexander Goldenberg, Mariann Wang*, and Daniel Mullkoff*, for her Amended Complaint alleges as follows:

## NATURE OF THE ACTION

        1.     When Plaintiff J.S. was a fourteen-year-old girl, in 1986, her parents entrusted her to the care and safety of Dalton Schools, Inc. ("Dalton" or the "Dalton School"), which operates the renowned Dalton School, and the Dalton School's then-Headmaster, Gardner P. Dunnan ("Dunnan"). Her family came from modest means, and when the Dalton School offered her the once-in-a-lifetime opportunity to attend the well-regarded institution tuition-free, and to live in the Upper East Side home of its Headmaster near the school as a family helper, her

―――――――――――――――

[1] Plaintiff is using the initials "J.S." in this Amended Complaint in place of her real name. Plaintiff intends to file a motion to proceed under her initials on the basis of her privacy because her allegations concern sexual abuse. *See, e.g., WGC, Jr. v. Roman Catholic Diocese of Paterson*, No. Civ. A. 95-2145 (JCL), 1996 WL 1177356, at *2 (D.N.J. Feb. 20, 1996). For the same reason, this Amended Complaint does not provide Plaintiff's street address. *See* Local Rule 10.1(a).

* Mariann Wang and Daniel Mullkoff will shortly file applications for admission *pro hac vice*.

parents leapt at the chance. Dalton has its principal place of business at 108 East 89th Street, New York, New York 10128. Upon information and belief, Dunnan resides at 106 East 85th Street, New York, New York 10128. Plaintiff J.S. resides in Hudson County, New Jersey.

2. J.S. enrolled at Dalton as a ninth grader and lived in the family home of the Headmaster. Dalton and Dunnan acted as J.S.'s household and in place of her parents in every material respect, providing education, shelter, clothing, meals, activities, emotional support, and trips to Dunnan's house in New Jersey.

3. J.S. and her family were thrilled, believing that J.S. was getting an unrivaled chance to expand her academic possibilities, be introduced to and make connections with New York City's highest society, and to fundamentally expand her education and future opportunities.

4. Instead, J.S. was sexually assaulted, repeatedly, by Dalton's Headmaster. Dunnan used and applied the tremendous power, resources, and discretion that Dalton granted him as its long-time head of school, preying upon the 14-year-old given over to Defendants' care. Dunnan assaulted J.S. repeatedly, both in his apartment near Dalton and in his home in New Jersey, all while J.S. was entrusted to Defendants' care. In the course of these various assaults, Dunnan repeatedly touched J.S. without her consent, fondling her breasts, sticking his tongue in her mouth, disrobing and groping her, laying on top of her, and thrusting his genitals against her.

5. Despite being entrusted to care for J.S. *in loco parentis*, Dalton turned a blind eye to this sexual abuse, permitting Dunnan to abuse J.S. over the course of several months and acting negligently in hiring, training, and failing properly to supervise Dunnan. On information and belief, Dunnan used the power Dalton granted him, unfettered, to act

2

inappropriately and hurt others as well. Only in 1997 did Dalton finally force Dunnan to resign after it was discovered that he had engaged in a romantic and sexual affair with an underling, a married female teacher he oversaw at the school.

6. Rather than open J.S.'s world and expand her opportunities – or, more basically, keep her safe and secure as a child in their care – Defendants subjected J.S. to a devastating, life-diminishing experience. The sexual abuse and broken trust she experienced as a child have permanently scarred J.S. She has suffered intense emotional harm, including depression and anxiety, as a result of Defendants' acts. Even decades after these incidents, J.S. is still unable to comprehend the impact they have had on her life. For many decades, she spoke only rarely about what Dalton's Headmaster did to her. She felt she had to keep it secret due to her deep sense of shame and her fundamental, albeit false, belief that the assaults were her fault.

7. Only recently, in the wake of numerous other women coming forward about their own experiences with sexual assault, has J.S. begun to realize that the abuse she suffered was not her fault and started to process the depth of harm that Defendants caused her.

## PARTIES

8. Plaintiff J.S. is an individual who resides in Hudson County, New Jersey.

9. Defendant Dalton Schools, Inc. is a not-for-profit corporation incorporated in the State of New York. Its principal place of business is located at 108 East 89th Street, New York, New York 10128. Its state of legal domicile is New York. At all relevant times, Defendant Dalton Schools, Inc. owned and operated the Dalton School. On information and belief, at all times relevant hereto, Dalton directed a broad range of activities into the State of New Jersey, including without limitation soliciting students, teachers, and/or funding in various

forms from within that state and/or engaging in activities in New Jersey in other manners sufficient to establish general jurisdiction or, in the alternative, specific jurisdiction over it. At all times relevant hereto, Dalton knew or should have known that Dunnan engaged in acts of inappropriate, abusive, and/or harmful behavior toward individuals over whom he had power or control and/or provided Dunnan unreasonable, unfettered, and unsupervised discretion such that it knew or should have known that Dunnan would engage in such acts or behavior. At all times relevant hereto, Dalton designated to Dunnan expansive, unfettered actual or apparent authority and/or discretion to recruit and/or accept students, including students of modest means, tuition-free into the school itself and/or to invite such students to live with him in his home, including, on information and belief, at the expense of or with the financial or other support of Dalton.

10. Defendant Gardner P. Dunnan is an individual who resides in the State of New York. Dunnan resides in New York County, New York. Dunnan was Headmaster of the Dalton School for over twenty years, from approximately 1975 until 1997. At all times relevant hereto, Dunnan engaged in repeated acts directed at and into New Jersey, including without limitation on behalf of Dalton and/or through recruiting students and teachers and engaging in acts in New Jersey sufficient to establish general jurisdiction or, in the alternative, to extend specific jurisdiction over him.

**JURISDICTION AND VENUE**

11. This Court has subject-matter jurisdiction under 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 and is between a citizen of this State and citizens of a foreign state.

4

12. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this district.

13. This Court has personal jurisdiction over Defendants because Defendants purposefully directed their activities at the state of New Jersey, and this action arises from those activities. On information and belief, at all times relevant hereto, Defendants also engaged in activities sufficient to give rise to general jurisdiction in New Jersey

14. As set forth below, during the time period that Defendants acted *in loco parentis* to Plaintiff J.S., the Headmaster of Dalton, Dunnan, brought J.S. to his home in New Jersey on approximately three separate occasions. During one of those trips, Dunnan sexually assaulted J.S. at his home in New Jersey, giving rise to the causes of action in this Amended Complaint. On information and belief, Dalton paid and/or reimbursed Dunnan for some or all of his expenses related to his trips to New Jersey.

15. When Dunnan brought J.S. to New Jersey, and when he sexually assaulted her in New Jersey, he acted within the scope of his employment for Dalton.

16. Upon information and belief, Dalton knew or should have known of Dunnan's inappropriate behavior toward female students or females in his care or under his supervision, including prior to J.S.'s matriculation at the school. Upon information and belief, Dalton took no steps whatsoever to investigate, explore or stop Dunnan's inappropriate behavior. Dalton's negligent supervision of Dunnan caused J.S. to be sexually abused in New Jersey when Dunnan took her there during the school year and while he was acting within the scope of his employment and both Dunnan and Dalton were acting *in loco parentis* to her.

17. Upon information and belief, Dalton solicits and advertises to students in New Jersey, and the student body includes students who reside in New Jersey.

18. Upon information and belief, Dalton's faculty includes residents of New Jersey.

19. Upon information and belief, Dalton solicits donations from alumni and other residents of New Jersey.

20. Upon information and belief, Dalton sponsors and/or participates in events in New Jersey each year.

## JURY DEMAND

21. Plaintiff hereby demands a trial by jury on all of her claims in this action.

## FACTUAL ALLEGATIONS

*Dalton Invites Plaintiff J.S. to Attend the School and to Live in Headmaster Dunnan's Home*

22. In 1986, Plaintiff J.S. was fourteen years old. Her childhood had been difficult. Her parents had divorced when she was two years old, and she had witnessed her mother's subsequent husband physically abuse her mother. Seeking greater family stability and life opportunities, J.S. moved in her with father, who lived in south Brooklyn. J.S.'s father's then-girlfriend worked at the Dalton School, a prestigious and exclusive school in Manhattan that, at the time, spanned preschool through high school.

23. Through that connection, J.S. and her father were invited to meet Defendant Dunnan, who was headmaster of the Dalton School, at his summer home in Putnam County, New York. J.S. and her father expressed an interest in the prospect of J.S. entering the

Dalton School in the fall of 1986 in the Ninth Grade. J.S.'s family was of modest means and could not have attended the school without financial support.

24. Dunnan served as headmaster of the Dalton School from 1975 until he was forced to resign in 1997. A recent professional biography of Dunnan's states that during his tenure as headmaster of the Dalton School, "the school expanded facilities, created a department of student support services, and achieved national renown for its Dalton technology plan. Endowment, scholarships and faculty salaries were all increased dramatically."

25. Upon information and belief, Dalton had granted Dunnan broad actual and/or apparent authority to act as Dalton's agent and without formal approval on an array of topics, including by giving him the power to admit a student without any formal application process and offer her free tuition and board.

26. J.S. did not go through a formal application process. Rather, shortly after J.S. met with Dunnan at his summer home, she was given the opportunity to work as a "family helper." Dunnan and his wife had a new baby at home, and J.S. assisted Dunnan's wife in caring for the baby and with household tasks.

27. At or shortly after the initial meeting, Defendants offered J.S. admission to the Dalton School as well as free tuition and room and board at the Dunnan home near Dalton.

28. Specifically, as part of joining the Dalton School, its Headmaster proposed that J.S. live with him and his family in a spare room in their apartment, which was located close to the Dalton School. Dunnan told J.S. that this proposed arrangement would allow her to avoid the long commute to the Dalton School from her father's home, which was in south Brooklyn, and also afford his family some additional occasional help, since she could continue to assist with household tasks or babysitting.

7

29. From J.S.'s perspective, this seemed like a dream. She was being given the opportunity to attend one of the most prestigious schools in the world, and given "special status" by living close to the school and in the headmaster's home. She was elated.

***Dunnan and Dalton Stand In Loco Parentis to and are Part of Plaintiff's Household***

30. J.S. moved into Headmaster Dunnan's apartment in or about September 1986. The living situation was initially welcoming. The Headmaster and his wife were kind to J.S. and generous with their time and money. They took her on outings and bought her a variety of clothes, including a winter coat. They took her to their second home in Ocean County, New Jersey.

31. Dalton's Headmaster, Dunnan, acted in a parental role towards J.S. as she lived with him and attended the Dalton School. This was the first time J.S. had been in a seemingly stable living situation, and she felt that she should be and had to be grateful toward the Dalton School and Dunnan.

32. J.S. began to attend the Dalton School as a Ninth Grader in the fall of 1986.

33. For J.S., the Dalton School was effectively a boarding school between September 1986 and January 1987. In addition to attending classes and participating in school-sponsored activities, J.S. resided with Headmaster Dunnan in close proximity to the school.

34. During that time period, J.S.'s parents had transferred to Dalton the power to act as J.S.'s guardian at all times of the day and week. Thus, J.S. was supervised during the school day by teachers and other administrators, and at all other times by Headmaster Dunnan.

35. During that time period, Dalton served as J.S.'s household. Dalton provided Plaintiff with all aspects of a home – her education, shelter, meals, clothing, recreational activities, and emotional support.

*Headmaster Dunnan Sexually Assaults Plaintiff*

36. This initial sense of home and stability – the first real stability she experienced in her childhood – was ultimately shattered when Headmaster Dunnan, using his position as Dalton's head of school and J.S.'s caretaker at home, sexually assaulted J.S. on four separate occasions between September 1986 and January 1987, when she was fourteen years old.

37. The first incident occurred when J.S. left the bathroom in the Headmaster's apartment, having just taken a shower. J.S. was wrapped in a towel, necessarily passing through the living room as she walked from the bathroom back to her room. Headmaster Dunnan, who was lying on the couch in the living room, asked J.S. to come over to him. Dunnan then pulled J.S. on top of him and pulled her towel off, at which point he began to grope her and rub her body. J.S. was completely in shock and had no understanding of what was happening to her. She had never before even kissed a boy, much less been sexually touched or grabbed by anyone. She was confused and disturbed, but also did not know how to process what was going on or even really know what had happened, given that this was the Headmaster of her school and the person who had given her the opportunity to attend Dalton for free and otherwise seemed to welcome her into the school and his family. Eventually, J.S. was able to shove Dunnan away and escape to her room.

38. Another incident occurred one weekend during the school year when Dunnan and his wife brought J.S. to their home in Ocean County, New Jersey. They brought J.S. to that home approximately three times. The following is a true and accurate copy of a photograph of J.S. and Dunnan at that home in Ocean County, New Jersey during that time period:



39. Late one night, J.S. had fallen asleep on the couch in the Ocean County home. She awoke to find Dunnan lying on top of her, fondling her breasts. J.S. was yet again shocked, frightened and appalled at what Dunnan had apparently been doing to her as she slept. J.S. initially froze, but eventually managed to escape to another room.

40. Yet another incident occurred when Headmaster Dunnan entered the kitchen in his apartment one morning. Dunnan initially gave J.S. a hug, then proceeded to lift J.S. up, shove her onto the kitchen table, and forcibly kiss her, shoving his tongue down into her

10

mouth. J.S. was once again in shock by this disgusting conduct and did not know what was happening or what she could possibly do. Eventually, she managed to escape the situation.

41. The fourth incident occurred in Dunnan's apartment, in or about January 1987. The Headmaster came into J.S.'s bedroom while the lights were out. He climbed on top of her in her bed, and thrust his genitals up against J.S.'s genitals through their clothes. She was again frozen and in fear and shock.

42. While Dunnan was assaulting J.S. in this manner, J.S. heard Dunnan's wife walk by outside in the hallway. Dunnan suddenly got up and left the room. J.S. then heard shouting from the other room from Dunnan and his wife.

43. On information and belief, Dunnan's wife did not see what was happening but had reason to be suspicious of her husband.

44. On information and belief, another girl had lived with the Dunnans and attended Dalton prior to J.S.

45. When J.S. left her room that evening shortly after Dunnan had assaulted her, Dunnan's wife told J.S., in sum and substance, "I'm sorry, but you have to leave." J.S.'s father came to pick her up that evening, and she took her belongings and left Dunnan's apartment for good.

46. J.S. attempted to continue her studies at the Dalton School, but found herself unable to do so. She walked the halls feeling simultaneously disgusted and as if she herself had no value. She also feared that at any moment she might come face to face with Dunnan, who plainly believed that, as Headmaster, he could do anything to her, at any time.

47. J.S. soon transferred to a different high school.

48. Upon information and belief, Dalton was aware or should have been aware that Dunnan was likely to engage in sexual misconduct or other harmful behavior.

49. Dunnan served as headmaster of the Dalton School for approximately twenty-two years until he was forced to resign in 1997.

50. According to the *New York Times*, Dalton officials said at the time that Dunnan's resignation was prompted in part by his affair with a married female teacher at the school. On information and belief, the Dalton School took action against Dunnan only when his misbehavior became widely known and undeniable, as opposed to earlier misbehavior that could be deliberately ignored and/or swept under the rug. On information and belief, Dunnan has continued to be employed in educational settings, even since his separation from Dalton.

***Defendants' Conduct Has Inflicted Great Harm on Plaintiff***

51. J.S. did not know how to process what Defendants had done to her. She was a child when this had occurred – only fourteen years old – and had never even kissed anyone before. She suffered immense emotional pain and depression. She had no idea why Dunnan had assaulted her, and viewed his choice to do this to her as a direct reflection of her own worthlessness.

52. For decades, J.S. revealed to nearly no one what Dunnan had done to her. She internalized her belief and understanding that it was her fault that the Headmaster had done this. Indeed, even when J.S.'s father came to pick her up that evening in January 1987 and saw how upset she seemed, she would not say anything about what the Headmaster had done.

53. J.S. saw numerous therapists over the years but focused predominantly on the physical abuse she had witnessed as a younger child and internalized. She essentially had no discussion of the sexual abuse, and certainly never explored the damage it had caused her.

54. In the fall of 2016, when numerous women publicly accused then-candidate Donald Trump of sexual assault, J.S. began to again consider her own experience of being sexually assaulted by Dunnan. J.S. finally began to speak with a therapist about what Dunnan had done to her and to try to understand the damage that the assaults had caused her.

55. But J.S.'s attempt to process the sexual assaults was most dramatically impacted by the events of the fall of 2017, when sexual assault allegations against Harvey Weinstein and numerous other powerful men began to dominate the headlines.

56. J.S. began to see that she was not alone, and that in fact, it might not be her fault after all.

57. Through a process of addressing the abuse more directly, and with psychiatric professionals, J.S. has finally come to realize that the abuse was not her fault. She has also begun to realize the extent of the harm that the abuse has caused her.

58. Even today, J.S. has not fully grasped the depth of emotional harm that Defendants' actions have caused. Although she has finally been discussing the abuse with a therapist, she remains in the preliminary stages of engaging with the realities of what happened to her and the effect it has had.

59. This action is timely pursuant to N.J. Stat. Ann. § 2A:61B-1(b) because two years have not passed after J.S.'s reasonable discovery of her injuries and their causal relationship to Defendants' acts and omissions.

60. This action is likewise timely pursuant to N.J. Stat. Ann. § 2A:61B-1(c) because any applicable statute of limitations should be deemed tolled due to equitable grounds, including without limitation J.S.'s mental state.

## FIRST CAUSE OF ACTION
### (New Jersey Child Sexual Abuse Act, N.J. Stat. Ann. § 2A:61B-1)

61. Plaintiff hereby incorporates each of the foregoing paragraphs as if fully set forth herein.

62. Headmaster Dunnan engaged in acts of unwanted sexual contact with Plaintiff at a time when Dunnan was an adult and Plaintiff under the age of 18 years. In each of the incidents described above, Dunnan intentionally touched Plaintiff's intimate parts, either directly or through clothing, for the purpose of sexually arousing or sexually gratifying himself.

63. Upon information and belief, Dalton knowingly permitted and/or acquiesced in Dunnan's sexual assaults of Plaintiff.

64. At the time that Dunnan sexually assaulted Plaintiff, Dunnan and Dalton were guardians or other persons standing *in loco parentis* within Plaintiff's household, within the meaning of N.J. Stat. Ann. § 2A:61B-1(a)(1).

65. The acts and omissions of Dunnan and Dalton constituted sexual abuse within the meaning of N.J. Stat. Ann. § 2A:61B-1.

66. At all relevant times, Dunnan was an employee of Dalton acting within the scope of his employment. Dalton is therefore also liable for the torts committed by Dunnan under the doctrine of *respondeat superior*.

67. At all times relevant hereto, Dunnan was given unfettered discretion and power such that he acted as an actual and/or apparent agent of Dalton.

68. As a result of the acts and omissions of Dunnan and Dalton, Plaintiff suffered severe and ongoing emotional distress and other psychological injuries in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
**(Battery - New Jersey Common Law)**

69. Plaintiff hereby incorporates each of the foregoing paragraphs as if fully set forth herein.

70. In committing the acts described above, Dunnan intentionally engaged in non-consensual touchings of Plaintiff.

71. As a result of these non-consensual touchings, Plaintiff suffered damages in an amount to be determined at trial.

72. At all relevant times, Dunnan was an employee of Dalton acting within the scope of his employment. Dalton is therefore liable for the torts committed by Dunnan under the doctrine of *respondeat superior*.

## THIRD CAUSE OF ACTION
**(Intentional Infliction of Emotional Distress - New Jersey Common Law)**

73. Plaintiff hereby incorporates each of the foregoing paragraphs as if fully set forth herein.

74. In committing the acts described above, Dunnan acted intentionally and/or recklessly in deliberate disregard of the high degree of probability of the emotional distress that Plaintiff would suffer.

75. Dunnan's conduct was so outrageous and extreme in degree as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community.

76. Dunnan's actions proximately caused Plaintiff to suffer severe emotional distress.

77. At all relevant times, Dunnan was an employee of Dalton acting within the scope of his employment. Dalton is therefore liable for the torts committed by Dunnan under the doctrine of *respondeat superior*.

78. As a result of this intentional infliction of emotional distress, Plaintiff suffered damages in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION
### (Negligent Hiring, Retention, and Supervision - New Jersey Common Law)
### (Against Defendant Dalton)

79. Plaintiff hereby incorporates each of the foregoing paragraphs as if fully set forth herein.

80. At all relevant times, Dunnan was an employee of Dalton acting within the scope of his employment.

81. Upon information and belief, Dalton was negligent in hiring Dunnan as headmaster of the Dalton School, in retaining Dunnan in that position, and in supervising Dunnan while he was employed by Dalton.

82. Upon information and belief, Dalton knew or had reason to know that Dunnan was particularly dangerous and unfit for the job.

83. Upon information and belief, Dalton could reasonably have foreseen that Dunnan's dangerousness and unfitness created a risk of harm to other persons.

84. Upon information and belief, through Dalton's negligent hiring, retention, and supervision of Dunnan, Dunnan's dangerousness and unfitness proximately caused Plaintiff to suffer damages in an amount to be determined at trial.

WHEREFORE, Plaintiff respectfully requests that judgment be entered against Defendants as follows:

a. Awarding compensatory damages for all emotional distress, psychological harm, anxiety, humiliation, pain and suffering, family and social disruption and other harm, in an amount to be determined at trial;

b. Awarding punitive damages in an amount to be determined at trial;

c. Awarding attorneys' fees and costs pursuant to N.J. Stat. Ann. § 2A:61B-1(h) and any other applicable statute or law;

d. Awarding pre- and post-judgment interest on all such damages, fees and/or costs; and

e. Awarding such other and further relief as this Court may deem just and proper.

Dated: New York, New York
June 29, 2018

CUTI HECKER WANG LLP

By: /s/Alexander Goldenberg
Alexander Goldenberg (AG 1128)
Mariann Meier Wang*
Daniel Mullkoff*
305 Broadway, Suite 607
New York, New York 10007
(212) 620-2603
agoldenberg@chwllp.com
mwang@chwllp.com
dmullkoff@chwllp.com

*Attorneys for Plaintiff*

* motion for admission *pro hac vice* to be filed shortly